**Federal Defenders**
OF николаев NEW YORK, INC.

One Pierrepont Plaza-16th Floor, Brooklyn, NY 11201
Tel: (718) 330-1200 Fax: (718) 855-0760

David Patton
*Executive Director and
Attorney-in-Chief*

Deirdre D. von Dornum
*Attorney-in-Charge*

The Honorable Pamela K. Chen	April 12, 2024
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re:   *United States v. Nicholas Welker*, No. 23-CR-141 (PKC)

Contrary to initial impressions, Nicholas Welker is in many ways typical of defendants who come before this Court. Like many, his background is riddled with physical and emotional abuse. Like many he suffers from severe addiction issues, although his drug of choice, fentanyl, is particularly deadly. Like many, he has had multiple psychiatric hospitalizations, arrests, and lengthy periods of homelessness. Like many, he has never had a job or a serious romantic relationship and is utterly lacking in self-esteem or realistic goals. He is someone who is in desperate need of support if he is to lead a full and productive life. Neither his violation of the law, nor his offensive views, change the fact that he is a fellow human being deserving of sympathy who can get on a better path forward with the appropriate help.

He gravitated to extremist groups on the Internet for a sense of belonging, and to avoid his real world problems, and crossed the line into criminal behavior when he participated in making an on-line threat, specifically, the creation and subsequent sharing of an image or "meme" which contained a threat against a journalist that had reported on the extremist group of which he was a member. Crucially, there is no evidence he (1) engaged in any illegal conduct beyond the creation and posting of the meme; (2) took any tangible steps to carry out the threat; or (3) engaged in any related acts of violence. This is so even though approximately 18 months elapsed between the time the alleged threat was first communicated and Mr. Welker's arrest.

Mr. Welker should be punished for his conduct, but the punishment here should reflect the crime and his history. While no threat is acceptable, Mr. Welker's conduct falls at the less egregious end of the spectrum of threats cases. More serious threats cases involve repeated harassment or accompanying conduct (or a criminal history) that evince the capacity or intent to act on the threat. These aggravating facts are not present here. While the victim has indicated the on-line postings of people the defendant associates with made his threat particularly frightening – a point the defense does not doubt -- the defendant is simply not accountable for the conduct of others who are not co-conspirators just because they share a Telegram channel or ideology, just as the rest of us are not responsible for the conduct of our Facebook friends. The conduct of others does not reflect the defendant's dangerousness or likelihood of recidivism.

1

Similarly, the defendant's offensive views do not make his case more aggravated for purposes of sentencing. S*ee* [United States v. Brown, 479 F.2d 1170, 1174 (2d Cir.1973)]( "[B]as[ing] [a] sentence on … revulsion arising out of [a defendant's] social or political views … would be improper."). That the threat was directed at a journalist for doing his job and thus implicates important societal values is similarly unremarkable for sentencing. Threats cases invariably implicate broader values – many relate to the functioning of our justice or political system -- as a survey of recent cases in this district below demonstrates.

Based on Mr. Welker's conduct and history, a below guidelines sentence is appropriate, whether based on a departure or variance. His offense is not aggravated, and his criminal record is largely old and mainly relates to drug use. Assuring that Mr. Welker finally gets treatment and a job and requiring him to become a productive member of society will go further toward meeting the purposes of sentencing than keeping him in jail for another year or two. Mr. Welker's lack of purpose, goals, structure, and anything resembling accountability and real-world connection doubtless fueled his descent into the dark corners of the Internet and addressing these issues sooner rather than later will advance Section 3553's goals more than prison.

## PERSONAL HISTORY[1]

Nicholas Welker was born on April 7, 1991, in Santa Clara, California to his mother Judy and his father Mark. His parents divorced when he was three years old and while he says he was raised by both of his parents, his mother was his primary caretaker. Judy, who is in her mid-to-late 60's, worked as a nurse's assistant and receptionist within the Kaiser Permanente hospital system. Mr. Welker's father works as an electrician.

When Mr. Welker was approximately seven years old, his mother became pregnant and they moved into the home of her partner, Raymond ("Ray"). He was thrilled to gain a younger brother, Raymond Jr., whom he affectionately calls "R.J." Mr. Welker explained that since his arrest he has remained in close contact with his mother and brother. In the past, his substance use and his extremist ideologies have resulted in tension and periods of estrangement. His family recognizes that his mental health and substance use disorders have significantly impacted his beliefs and behaviors, and the family does not share his extremist views. Mr. Welker's mother and brother worry about him immensely and have stepped up to support him during this time, with the hopes that this intervention will result in sobriety and stability. His father, on the other hand, remains estranged.

*Adverse Childhood Experiences*

Mr. Welker experienced physical abuse at the hands of his stepfather, Ray. He described being choked and hit by him beginning at the age of eight until his mother separated from him when he was approximately 14 years old. The physical abuse was persistent. Mr. Welker explained that Rick was addicted to methamphetamines and was ultimately incarcerated for selling drugs.

[REDACTED]

---

[1] Allison Berger, LMSW, collaborated on this portion of the report.



*Mental Illness and Substance Use: Self-Medication and Addiction*

When Mr. Welker was 8 years old, he was diagnosed with Attention-Deficit/Hyperactivity Disorder (ADHD). Based on the PSR, it was his school counselor that first identified symptoms and behaviors consistent with ADHD. It is of note that his change in behavior at school was documented around the same time he reports that Ray started to physically abuse him.

Mr. Welker disclosed that he started drinking alcohol at the age of 14, around the time his mother and stepfather separated. Upon reflection, he believes that his drinking was an attempt to self-medicate profound anxiety. He realizes now that alcohol undoubtedly exacerbates his anxiety. Mr. Welker was eventually prescribed Klonopin to treat his anxiety.

From age 14 to 17, Mr. Welker drank excessively. Based on medical records from the Valley Medical Center from 2008, Mr. Welker who was 17 years old, was being treated with psychotropic medication to treat ADHD, anxiety, and depression. At this time, he was still attending high school and his alcohol use was accelerating. In April of 2008, he created a dangerous cocktail of his prescribed psychiatric medication and alcohol resulting in his being hospitalized for alcohol poisoning. He was placed on a 72-hour psychiatric hold by the hospital. Mr. Welker stopped attending school when he was in his senior year of high school, shortly after this incident. He was subsequently hospitalized for suicidal ideation on three occasions, including an incident where his mother called EMS because he sprayed household cleaner in his mouth.

When Mr. Welker was approximately 17 or 18 years old, he explained that he contracted a staph infection and was prescribed pain medication. He reports that this was his first experience with opioids. He also disclosed that he sustained back and neck injuries in several car accidents that occurred when he was in his late teens and early twenties warranting short-term management with prescriptions for opioid pain relievers. Medical records reflect several indications that he is living with "Chronic lower back pain, sciatica, chronic pain disorder, myalgia, and lumbar disc herniation."

Medical records from the years that follow, from 2009 to 2023, tell us an all too familiar story of pain, medically sanctioned opioid pain relief, dependence, addiction, desperation, rock-bottoms, drug-related arrests, attempts at sobriety, depression, and relapse. Mr. Welker's "drug seeking" behavior at hospitals and clinics in San Jose/Santa Clara is well documented – his medical records are replete with instances of him showing up at hospitals and clinics seeking medication -- and correlates directly with his arrest record, history of homelessness, disruptions in his familial relationships, and his participation in the instant offense.

Mr. Welker's efforts to find stability and structure were largely sidelined by his profound drug addiction and neglected mental health. At the age of 19, he attended Mountain View Los Altos Adult Education and earned his GED, a significant accomplishment and a positive factor for his

reentry. He enrolled and completed a few college-level courses at De Anza College in Cupertino, California but his drug use and mental health greatly impacted his ability to complete more than just a few courses. He primarily used heroin for 10 years until 2019, when he was introduced to fentanyl which he used until his arrest in March of 2023. He says fentanyl was simply more available. He attempted treatment on several occasions, often mandated by the Court in response to drug-related arrests. Mr. Welker's longest inpatient treatment lasted five months. He recognizes that his 15 years of opioid addiction impacted his relationships with his family, resulted in unemployment, homelessness, and incarceration. His drug use started at the age of 18 and he has been in a state of arrested development, struggling to reach the milestones of a man in his early thirties.

During a recent visit with Mr. Welker, he told Ms. Berger, "I am glad I got this intervention. This is the longest time I've been sober." For the first time since he was in high school, he is sober and is only taking his prescribed mental health medication. He does not take this fact likely, and while he is proud of this achievement (by all reports it is very easy to obtain and use illicit substances at the MDC) he is also repentant that it took the instant offense and his detention to choose long-term sobriety. In July of 2023, Mr. Welker was interested in participating in residential substance use treatment. A referral was made to Samaritan Village and after completing a roughly two-hour screening he was accepted into their program. He asserted to his team and to the intake staff that he was committed to his sobriety. After his bond applicated was denied, he took steps to ensure that he had the proper infrastructure in place to maintain his sobriety while at the MDC Brooklyn. Mr. Welker took it upon himself to advocate for Medication Assisted Treatment (MAT) at the MDC. By doing so, he is appropriately managing urges to use while in detention and has positioned himself with greater success for his sobriety upon his release. Upon his release, he will be able to access the structured support of an intensive substance use treatment program while continuing to engage in MAT treatment. Upon his ultimate release, whenever that is, Federal Defenders social workers will be able to assist Mr. Welker in making referrals for substance use and mental health treatment so that he can find purpose and be independent without relying solely on substances and public systems. Mr. Welker is hopeful that this is the beginning a new chapter where he will be able to rely on himself.

*Introduction to Extremism*

In 2009, when Mr. Welker was in custody in California, he was first introduced to white supremacist groups. Whether he initially gravitated to such groups to feel safe in jail[2] or to feel some false sense of belonging and value is unclear, but plainly his ongoing affiliation has fulfilled the latter purpose. Mr. Welker has spent much, if not all, of his adult life seeking acceptance and purpose. He has struggled to manage the symptoms of his mental health and his addiction to opiates. The cycle of his recovery and relapse (both with his mental health and substance use) he has experienced over the years has been debilitating and resulted in periods of homelessness, hospitalization, incarceration, and isolation.

---

[2] *See e.g.* Christopher Blackwell, "How Prison Turned my Childhood Friend into a New-Nazi," The Marshal Project, Aug. 6, 2000, available at https://www.themarshallproject.org/2020/08/06/how-prison-turned-my-childhood-friend-into-a-neo-nazi

4

He came to believe the extremists he associated with on the Internet were a healthier crowd than his real world friends.  As he puts it "all the people I knew in my real life were drug users. No one was sober." The online communities he was in were "the only sober people I knew." His real life relationships were transactional and dysfunctional: someone would come crash at his place in exchange for drugs, or vice versa.  He viewed his online associates, by contrast, as a supportive community.  He felt like he was well-liked, trusted, and wanted – something he did not feel often in the "real world."

## Offense Conduct

The offense conduct in many ways speaks to the false sense of importance Mr. Welker felt in his on-line world.  The victim, a journalist, had traveled to Estonia to interview the leader of his extremist group, a 14-year-old who Mr. Welker reverentially called "Commander." The group did not want scrutiny from the media.  Mr. Welker at this point was spending his days and nights posting and sharing racist and otherwise offensive imagery in a Telegram channel.  A minor co-conspirator shared with Mr. Welker a template of an image of someone with a gun to his head, stating "There is no more fkd propaganda that I can edit, tell me what face to put on this photo," Mr. Welker proposed an image of the victim and helped draft the caption.  In his warped view, he was being protective of "Commander" at the time.

As noted above, there is no evidence Mr. Welker took any further action beyond the creation of this image and its reposting.

Mr. Welker has participated in posting other extremely graphic images and statements, glorifying violence against certain groups.  While these images are troubling, other than the threat they were not criminal.  As the Second Circuit explained in the case involving a defendant's on-line chats about murdering and cannibalizing his wife:

> Although it is increasingly challenging to identify [the "line between fantasy and criminal intent"] in the Internet age, it still exists and it must be rationally discernible in order to ensure that a "person's inclinations and fantasies are his own and beyond the reach of the government." *Jacobson v. United States,* 503 U.S. 540, 551–52, 112 S.Ct. 1535, 118 L.Ed.2d 174 (1992). We are loath to give the government the power to punish us for our thoughts and not our actions. *Stanley v. Georgia,* 394 U.S. 557, 565, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969). . . .Fantasizing about committing a crime, even a crime of violence against a real person whom you know, is not a crime.
>
> This does not mean that fantasies are harmless.  … Yet we must not forget that in a free and functioning society, not every harm is meant to be addressed with the federal criminal law.

*United States v. Valle*, 807 F.3d 508, 511 (2d Cir. 2015).  So too is it here.  The defendant's other on-line postings are simply beyond the reach of the law.  Though he surely crossed the line in connection with the charged conduct, his sentence must be based on that conduct.

5

## Horizontal Departure under the Guidelines

The parties dispute whether Mr. Welker is in Criminal History Category IV or V, but in either case, the defense submits a horizonal departure to CHC III is appropriate.  The Guidelines provide "If reliable information indicates that the defendant's criminal history category substantially over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes, a downward departure may be warranted." U.S.S.G. 4A1.3.  A horizontal departure "is most frequently used when a series of minor offenses, often committed many years before the instant offense, results in a CHC that overstates the seriousness of the defendant's prior record."  *United States v. Carrasco*, 313 F.3d 750, 757 (2d Cir. 2002).

Mr. Welker's present time in custody is by far the longest term he has ever been in jail.  His longest prior sentence was 110 days in jail in 2013.  Moreover, his entire criminal record dates from 2013 to 2016.  This case thus falls squarely within the range cases where defendants frequently receive departures.  Defendants in Criminal History Category IV or V typically have served state prison sentences.  "Obviously, a major reason for imposing an especially long sentence upon those who have committed prior offenses is to achieve a deterrent effect that the prior punishments failed to achieve. *United States v. Mishoe*, 241 F.3d 214, 220 (2d Cir. 2001). There is simply nothing to suggest a lengthy sentence is necessary here, where, Mr. Welker has already been in jail several times longer than ever before.  His time in jail represents adequate deterrence.

## Application of Section 3553

Regardless of whether the Court deems a departure appropriate, the defense submits a Guidelines sentence would be "greater than necessary" to achieve the purposes of sentencing.  18 U.S.C. § 3553.  As noted above, the defendant's conduct here was extremely limited and involved no conduct indicative of an intent to carry out the threat.  The Internet became Mr. Welker's escape from the other negative influences in his life and he descended into a rabbit hole of hate and extremism.  He recognizes what he did was wrong.

He has never learned to live as a functioning adult in the real world.  His present period of sobriety in jail is the longest of his life.  The most important aspect of any sentence the Court imposes – in terms not only of rehabilitation but protection of the public -- will be addressing Mr. Welker's drug problems and requiring him to become a productive member of society.  He is still a young man.  His drug use, idleness and lack of accountability and social connection are at the core of his criminal behavior.  Whether he abandons his hateful ideology is beyond the purview of the Court but requiring him to spend his days *doing something* would surely go a long way toward steering him away from the conduct, and perhaps the associations, that landed him in jail.  There is a real possibility that sitting in jail and being clothed, fed and now being given medication assisted treatment is only perpetuating the lack of responsibility and dysfunction that contributed to this offense.  Notwithstanding his sobriety, his appearance has deteriorated significantly in custody as the Court will see at sentence.

Neither deterrence nor protection of the public require a lengthy sentence.  As noted above he has already served more time than ever before.  His offense was non-violent and his Internet use will be monitored during any period of supervision.  He is not alleged to have any association with hate groups outside the Internet.

For his part, Mr. Welker says he looks forward to continuing his treatment, getting help with other programming and a job, and reconnecting with family, i.e., living a normal life, something he has never done. He acknowledges that he was spending way too much time on line and it was not healthy, and that his behavior in this case was unacceptable.

Finally, the need to avoid unwarranted sentencing disparities indicates that a below-Guidelines sentence is appropriate. Below is a survey of all cases where a defendant was convicted of violating 18 U.S.C. § 875(c) in this district opened and closed in the last 10 years based on a PACER search. Cases where defendants received sentences at the high end of the Guidelines or above the Guidelines range involved decidedly worse facts than here.

> *United States v. Laufer* 15-77 (RJD), involved a defendant who made multiple threats to kill the Executive Director of the Council on American-Islamic Relations. The threat came after the defendant had been arrested and charged in state court with stabbing someone entering a mosque in Queens and yelling "I will kill you Muslim." (Complaint, Dkt. # 1.) The Guidelines were 15-21 months. (Government Sentencing Memo (Redacted), Dkt. # 69). The Court imposed a sentence of time served, which amounted to approximately 13 months, and a period of home detention.
>
> In *United States v. Hughes*, 17-173 (MKB) the defendant stalked a high school pen pal over a period of decades, causing her to seek restraining orders and move to Europe, and apparently had done the same to additional victims. The victim was a teacher, and the defendant's messages contained statements threatening both her and her students with abduction and torture. (Government Sentencing Memo, Dkt. # 47). The defendant's Guidelines were 10 to 16 months and he received a sentence of one year and one day, which in practice, is equivalent to a sentence close to 10 months due to the good time statute.
>
> The defendant in *United States v. Lucio Celli*, 19 CR 127 (PAE), sent threatening communications to various judges of this Court and the Second Circuit. Mr. Celli received an agreed-upon sentence of time served, which amounted to approximately four-and-a-half months in prison, which was well below the Guidelines. (Government Sentencing Memo, Dkt. # 175)
>
> In *United States v. Octavia Telfair*, 19-CR-270 (ILG), the defendant repeatedly threatened the victim for testifying against her brother in a criminal proceeding. (Gov't Sentencing Memo, Dkt. # 60). The defendant's Guidelines were 10 to 16 months. *Id.* She received a sentenced of probation.
>
> In *United States v. Scott Allan Smith,* 19-CR-421 (RJD), the Court imposed the maximum five-year sentence on a defendant whose Guidelines were 46 to 57 months. Almost immediately after being released from a seven-year felony assault conviction, the defendant absconded from parole and repeatedly threatened the prosecutor from his case and her five-year-old daughter by phone and text, including, "I just want to tell you, you are about to die ... that little girl in the background is going to watch you die" and that he would "put a bullet in your child right in front of you." (Second Circuit Mandate affirming sentence, Dkt. #52).
>
> In *United States v. Feeney,* 20-CR-541 (WFK), the Court imposed a top of the Guidelines sentence of 18 months on a defendant who left a voicemail for a lawyer who had obtained

7

a favorable result for an African-American man charged with assault on a white victim. The threat said "this is for the n****r lover [last name of the attorney]," and advised him to tell his client "we know where every one of his family members live," and "we will execute that n****r's family. They will be hunted down and f**king beaten to death." The Court's statement of reasons cited four similarly racist telephonic threats to others, including two to members of Congress, that did not factor into the Guidelines. (Dkt. #35 at 6-8).

In *United States v. Florea*, 21-CR-37 (EK), the Court sentenced the defendant to 33 months, above the 15-21 months Guidelines, following his conviction for making interstate threats *and* possessing ammunition as a previously convicted felon. The defendant made threats over the Internet after being unable to attend the January 6, 2021, riot at the Capitol. He threatened to kill Senator-Elect Warnock, and otherwise indicated that he was armed and ready to join the insurrection. ("I am awaiting my orders…armed and ready to deploy….".) (Gov't Sentencing Memo, Dkt. # 45.) The defendant had 1,000 rounds of ammunition and other weapons in his home at the time of his arrest and long history of domestic violence and had previously been convicted of possessing an assault weapon. (*See Id.*; s*ee* Transcript of Sentencing, Dkt # 38)

In *United States v. Breeyana Cadet and Kadijah Thuesday*, 21-CR-57 (SJ), both defendants received sentences of supervision only (one had served a month in jail) notwithstanding 10-16 month guidelines. The defendants threatened to retaliate against a witness for testifying in a federal criminal case. (*See* Gov't Sentencing Memo, Dkt # 113)

The above illustrates that sentences at the high end or above the Guidelines range are generally imposed on defendants with real histories of violence (*Smith, Florea*), or in cases involving patterns of threatening conduct (*Feeney*).

Two other recent cases before Your Honor are also illustrative, though involving different statutes. In *United States v. Khawaja Muhammad Farooq*, 19-CR-100 (PKC), the defendant pled guilty to a violation of 875(d), concerning threats to reputation or property only, and received the two-year maximum sentence, but was originally charged with violating Section 875(c) as well. The defendant threatened to disseminate nude photographs of Jane Doe if she did not resume their relationship; the threats were particularly harrowing because Jane Doe came from a conservative Pakistani village where women can be killed for bringing dishonor to their families. In *United States v. Brendan Hunt*, 21 CR 86 (PKC), the Court imposed a 19-month sentence on a defendant who was convicted of threatening federal officials at a trial – a trial at which the Court found he obstructed justice -- notwithstanding Guidelines of 41-51 months. Mr. Hunt had, among other things, posted a video indicating that "we need to go back to the U.S. Capitol when all of the Senators and a lot of the representatives are back there and this time we need to show up and slaughter the motherfuckers." (Transcript of Sentencing at 104.) The Court specifically indicated that it did not consider Mr. Hunt's views relevant to sentence. (*Id.* at 17, 105.) ("He can hold those views, as distasteful as they are, so long as he doesn't threaten anyone purposely because of those views, and even if he does it's not the view that matters, it's the threat that matters.")

Comparing Mr. Welker's case to those above show this is not a particularly aggravated case and that a Guidelines sentence is not necessary to avoid unwarranted disparities.

8

CONCLUSION

      Mr. Welker has accepted responsibility for his threat.  But he took no action to carry it out and has no significant history of violence warranting a high sentence.  Indeed, as noted above, his criminal history is less significant than the Guidelines suggest.  He is in desperate need of supervision, treatment, a job and a reentry to the community, from which he has been absent long before he was arrested, indeed his whole adult life.  Accordingly, the defense requests a non-Guidelines sentence.

                Respectfully Submitted,
                /s/
                Michael D. Weil
                Federal Defenders of New York, Inc.
                One Pierrepont Plaza, 16th Floor
                Brooklyn, NY 11201

cc: AUSA Andrew Reich
    AUSA Ellen Sise
    Probation Officer Maxine Marquez