

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

DMP:EHS/ADR
F. #2022R00305

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

April 17, 2024

By ECF

The Honorable Pamela K. Chen
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

> Re:   United States v. Nicholas Welker
>        Criminal Docket No. 23-141 (PKC)

Dear Judge Chen:

The government respectfully submits this letter in advance of the defendant Nicholas Welker's sentencing, which is scheduled for April 19, 2024.  On September 27, 2023, the defendant pleaded guilty to one count of conspiracy to send interstate threats in violation of Title 18, United States Code, Section 371.  The defendant's advisory sentencing range under the United States Sentencing Guidelines ("U.S.S.G" or "Guidelines") is 30 to 37 months' imprisonment.[1]  The defendant stipulated to this Guidelines calculation in a written plea agreement with the government.  The government advised the defendant, both in the written plea agreement and at the plea hearing, that the government may seek an above-Guidelines sentence.  As detailed herein, the Guidelines range does not adequately address (1) the seriousness of the defendant's conduct—including that the crime was motivated by the desire to stop the victim from reporting on the defendant and his group's hatred of and violence against racial and ethnic minority groups; (2) the defendant's flagrant disregard for the law and potential danger to the community; and (3) the need for both specific and general deterrence.  See 18 U.S.C. §§ 3553(a)(1), (a)(2)(A)-(C).  Accordingly, the government respectfully recommends an above-Guidelines sentence of 46 months' imprisonment.

---

[1] As explained in the government's objections to the Probation Department's Presentence Investigation Report ("PSR"), the Probation Department incorrectly calculated the defendant's criminal history as a category IV and his Guidelines calculation as 24 to 30 months imprisonment.  See ECF No. 31.  In fact, the defendant is in criminal history category V, resulting in the 30-to-37-months Guidelines range.

I.       Background[2]

      A.       Feuerkreig Division

      The Feuerkrieg Division ("FKD") is an international racially or ethnically motivated violent extremist ("RMVE") group. FKD has members in the United States and abroad. FKD members share a common goal of challenging laws, social order, and the government via terrorism and other violent acts. The organization encourages attacks on racial minorities, the Jewish community, the LGBTQ+ community, the U.S. Government, journalists, and critical infrastructure. In German, "feuer" means "fire" and "krieg" means "war."

      Members of FKD have regularly communicated through an encrypted social media and mobile messaging electronic communication service ("ECS-1") based outside the United States. ECS-1 advertises itself as a secure and untraceable communications platform. ECS-1 allows users to communicate one on one, in public or private group chats, and through "channels." As defined by ECS-1, channels are a tool for broadcasting public messages to large audiences and can have an unlimited number of subscribers. Posts in private messages, chatrooms, or channels may be forwarded to other private messages, chatrooms, or channels on ECS-1.

      B.       Death Threats Against the Brooklyn Journalist

      Beginning at least as early as August 29, 2021, Welker and other members of FKD repeatedly threatened to murder a Brooklyn-based journalist (hereinafter "Victim-1" or the "Brooklyn Journalist") who had reported on FKD including by interviewing members of FKD in his capacity as a journalist for a national news media company (hereinafter "News Media Company-1").

      Welker was the FKD member who made the decision to target the Brooklyn Journalist. On or about August 29, 2021, an ECS-1 user ("Minor Co-Conspirator-2")[3] sent a message to Welker that read, "There is no more fkd propaganda that I can edit, tell me what face to put on this photo." In response, also on or about August 29, 2021, Welker responded to Minor Co-Conspirator-2 with the Brooklyn Journalist's name and News Media Company-1.

      In response to Welker's request that a threat image be made against the Brooklyn Journalist, Minor Co-Conspirator-2 sent Welker an image of a gun aimed at the Brooklyn Journalist's head, with the words, "Race Traitor" covering his eyes. The caption stated "JOURNALIST FUCK OFF! YOU HAVE BEEN WARNED. [Victim-1] New York. Works as a Reporter for [News Media Company-1]. Responsible for Stalking our Boys for Information"

---

[2]       Unless otherwise noted, the following facts are taken from the PSR dated April 5, 2024, and the factual record in this case.

[3]       Unless otherwise noted, individuals are identified as they are in the complaint. See ECF No. 4.

(hereinafter the "August 2021 Threat").   The August 2021 Threat also states FEUERKRIEGDIVISION@RISEUP.NET.

A copy of the August 2021 Threat is pictured below.[4]



That same day, on or about August 29, 2021, Welker sent the August 2021 Threat to another minor co-conspirator ("Minor Co-Conspirator-1").  In response, Minor Co-Conspirator-1 wrote, "This is awesome I like this."  Welker responded with a smiley face image with hearts and wrote "Ty [thank you] [Minor Co-Conspirator-2] did the edit[.]  Was my idea[.]"

Also on or about August 29, 2021, Welker posted the August 2021 Threat in multiple ECS-1 group chats and channels composed of members of FKD, including in FKD's public channel.  Welker used the ECS-1 handle "King ov Wrath" to threaten the Brooklyn Journalist.

In or about August 2021, the Brooklyn Journalist learned of the August 2021 Threat made against him by members of FKD.  In an internal email at News Media Company-1, Victim-1 stated, "FYI.  I'm now getting explicit death threats from the terror group FKD online."  The August 2021 Threat itself indicates it was made based on Victim-1's reporting on FKD. Specifically, it names him as a reporter and accuses him of "Stalking our Boys for Information."

On or about September 4, 2021, in an ECS-1 group chat called "Dead Group" (as of September 5, 2021),[5] composed of members of FKD, Minor Co-Conspirator-2 wrote, "I send this shit to [Victim-1] on twitter?" and attached an image of the August 2021 Threat.  Another user responded, "send us a link to the message when you do it."

---

[4]      The August 2021 Threat has been redacted to protect the identity of Victim-1.

[5]      ECS-1 group chats can be renamed at any point in time by an administrator/group member.

Soon thereafter, also on or about September 4, 2021, in the same ECS-1 group chat "Dead Group," Minor Co-Conspirator-2 posted a screenshot of a Twitter handle tweeting the August 2021 Threat image at Victim-1's Twitter handle.  Also on or about September 4, 2021, Minor Co-Conspirator-1 retweeted the August 2021 Threat, including Victim-1's Twitter handle. Tweeting at someone's Twitter handle is a way of communicating with the user of the handle, because tweeting at a user's Twitter handle causes the tweet to appear in that user's Twitter notifications.  A copy of the tweet with the August 2021 Threat is pictured below.



The next day, on or about September 5, 2021, Minor Co-Conspirator-1 tweeted at the Twitter handle for Victim-1, "Hey how have you been my friend.  Have you seen the new stuff we made about you?  just thought id ask."  A copy of the tweet is pictured below.



On or about September 11, 2021, Welker messaged an Estonian-based minor ("ECS-1 User-1"), "no more stalking?"  ECS-1 User-1 responded, "Who what[?]"  In response, Welker said, "[News Media Company-1] fag[.]"  ECS-1 User-1 responded, "Nah I think I hope he is gone[.]"  Welker responded, "probably" "i doubt hes still around" "they need to find reliable

info they can actually get fast." The above communications appear to be a reference to Victim-1's reporting on FKD and specifically Victim-1's reporting on ECS-1 User-1.

On or about March 12, 2022, Welker posted the August 2021 Threat in an ECS-1 group chat that he owned called "wAr fire." The "wAr fire" group chat consisted of FKD members.

### C.    Welker Led FKD, a Violent, Extremist Group

Welker was at one time the leader of FKD, a world-wide RMVE group. He acknowledged his leadership of FKD in his online communications. For example, on or about October 5, 2021, Welker communicated the following to ECS-1 User-1 about being the leader of FKD: "I've been thinking about my leadership a lot . . . I only specialize in a few things / Networking, connecting us with others and forming alliances. . . . I'm being the Public face of FKD while protecting the anonymity of everyone else." Being the public face of FKD allowed Welker to, in his own words, "protect" his co-conspirators. The other members of FKD needed "protection" because they were committing and planning to commit crimes of violence in furtherance of FKD's objectives.

### II.    Applicable Law

It is settled law that "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration, and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." Gall v. United States, 552 U.S. 38, 49 (2007) (citation omitted). Next, a sentencing court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, [the court] may not presume that the Guidelines range is reasonable. [The court] must make an individualized assessment based on the facts presented." Id. at 50 (citation and footnote omitted). When a factor is already included in the calculation of the [G]uidelines sentencing range, a judge who wishes to rely on that same factor to impose a sentence above or below the range must articulate specifically the reasons that this particular defendant's situation is different from the ordinary situation covered by the [G]uidelines calculation." United States v. Sindima, 488 F.3d 81, 87 (2d Cir. 2007) (quotation omitted, alterations in original). "[W]here the sentence is outside an advisory Guidelines range, the court must also state 'the specific reason' for the sentence imposed, in open court as well as in writing – 'with specificity in a statement of reasons form' that is part of the judgment." United States v. Aldeen, 792 F.3d 247, 251-52 (2d Cir. 2015), as amended (July 22, 2015) (quoting 18 U.S.C. § 3533(c)(2)).

Title 18, United States Code, Section 3553(a) provides that, in imposing a sentence, a court shall consider:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed—

5

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; [and]

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

18 U.S.C. § 3553(a).

At sentencing, "the court is virtually unfettered with respect to the information it may consider." United States v. Alexander, 860 F.2d 508, 513 (2d Cir. 1988). Indeed, "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C. § 3661.

Thus, the Court should first calculate the applicable Guidelines range, and then apply the Section 3553(a) factors to arrive at an appropriate sentence, considering all relevant facts. To the extent there remain any open issues as to the correct Guidelines range, the Court should first make any necessary finding regarding the correct range. Nevertheless, however the Court arrives at the correct Guidelines range, it still must fashion a sentence that meets the criteria of Section 3553(a) under the specific facts of this case.

III.     Analysis

A.     Sentencing Calculation

The government and the defendant agree on the offense level, to which the defendant stipulated in his plea agreement, and which Probation calculated in the PSR ¶¶ 28-38:

Conspiracy to Send Interstate Threats

| | | |
|---|---|---|
| Base Offense Level (§ 2A6.1) | | 12 |
| Plus: | Aggravating Role Enhancement (§ 3B1.1(c)) | +2 |
| Plus: | Using a Minor to Commit a Crime (§ 3B1.4) | +2 |
| Less: | Acceptance of Responsibility (§ 3E1.1(a), (b)) | -3 |
| Total: | | <u>13</u> |

However, the government disagrees with the PSR's calculation of the criminal history category as Category IV. In an addendum to the PSR filed on or about April 17, 2024, the Probation Department noted that it agrees with the government that the defendant's December 29,

6

2013 and March 21, 2017 convictions for violating a protective order and battery, respectively, should be counted toward the defendant's criminal history score because he was convicted of both crimes. See PSR Addendum at 2.

The government disagrees with Probation's conclusion that the 2013 conviction should receive only one criminal history point. Instead, because the defendant received a sentence of 60 days' incarceration (PSR ¶ 54), the defendant's 2013 conviction for violating a protective order should be assessed two criminal history points. Although this conviction was later set aside, the application notes indicate that set aside convictions "are to be counted." See U.S.S.G §4A1.2 Application Note 10 ("A number of jurisdictions have various procedures pursuant to which previous convictions may be set aside or the defendant may be pardoned for reasons unrelated to innocence or errors of law, e.g., in order to restore civil rights or to remove the stigma associated with a criminal conviction. Sentences resulting from such convictions are to be counted. However, expunged convictions are not counted. §4A1.2(j)."); United States v. Matthews, 205 F.3d 544, 548-549 (2d Cir. 2000) (analyzing U.S.S.G §4A1.2 Application Note 10 and holding that youthful offender convictions were properly included in calculating criminal history points). While the 2013 conviction for violating a protective order was set aside, it was not expunged. Accordingly, the violation of the protective order conviction results in an additional two criminal history points. See U.S.S.G §4A1.1(b).

With the two points added for the 2013 conviction, the defendant has 10 criminal history points. Given 10 criminal history points, the defendant is in criminal history category V, and his Guidelines range is 30 to 37 months, not 24 to 30 months (see PSR ¶ 98).

Although the defendant stipulated to the Guideline's calculation based on a criminal history category V in his plea agreement, see Court Ex. 1, Plea Agreement ¶ 2, the defendant nonetheless opposed the government's objections to the PSR. In his opposition, the defendant does not engage with an analysis of Application Note 10, Matthews, or otherwise address the argument that the 60-day sentence should result in additional criminal history points. Instead, the defendant argues that he "does not know the details" (which is interesting, considering that the defendant is in the best position to know the details of his criminal history), but "[i]f the defendant's final sentence for this offense was in fact a term of probation as the PSR indicates . . . then the conviction would only be eligible for one criminal history point, but would not change the criminal history score because the defendant already has the maximum four points for one-point offense." ECF No. 32 at 3. The defendant was sentenced on the violation of the protective order on or about December 29, 2013. Nearly three years later, in October 2016, the sentence was modified to two years of probation, then nearly six years after that, in June 2022, the conviction was set aside. There is nothing in the record that indicates the defendant did not serve his 60-day sentence. The defendant's argument is unavailing, and the correct criminal history calculation is a category V.

The defendant also argues for a horizontal departure under U.S.S.G. § 4A1.3, to a criminal history category III. Such a departure is inappropriate where the defendant has a lengthy, and violent criminal record. It may well be that drugs fueled or motivated the violence, but it is just not the case that the defendant's criminal record consists of only old drug possession cases. See ECF No. 34 at 2. The examples given for when a downward departure is appropriate are instructive:

(A)   Examples.—A downward departure from the defendant's criminal history category may be warranted based on any of the following circumstances:

(i)   The defendant had two minor misdemeanor convictions close to ten years prior to the instant offense and no other evidence of prior criminal behavior in the intervening period.

(ii)   The defendant received criminal history points from a sentence for possession of marihuana for personal use, without an intent to sell or distribute it to another person.

U.S.S.G. § 4A1.3, Application Note 3(A).

The defendant's nine convictions, including two violations of a protective order, one assault, and one battery, are a far cry from the above examples where departure is appropriate. The defendant states that his criminal history is between 2013 and 2016,[6] but that fails to include his 2017 battery conviction. The instant conduct was in 2021, thus there was not a significant period where the defendant was not committing crimes. If anything, the criminal history category underrepresents the defendant's criminal history. There are two criminal history points that are not counted because the defendant has received the maximum points under § 4A1.1(c). See PSR ¶ 47.

### B.   An Above-Guidelines Sentence Is Appropriate

The government respectfully submits that an above-Guidelines sentence of 46 months' imprisonment is appropriate in this case. The sentencing factors articulated in 18 U.S.C. § 3553(a) underscore the need for an above-Guidelines sentence. As noted above, the government put the defendant on notice at the time of his plea—through both the plea agreement and the plea hearing—that the government could seek an above-Guidelines sentence in this case.

### 1.   The Nature and Circumstances of The Offense

As an initial matter, the "nature and circumstances of the offense" for conspiring to send interstate threats, here, death threats, is very serious. The defendant and his co-conspirators, whom the defendant knew were minors, repeatedly threatened the Brooklyn Journalist with death threats. It is significant that the defendant used minor co-conspirators for two reasons. First, these underage co-conspirators were essentially insulated from federal criminal prosecution. Second, the underaged co-conspirators were young, impressionable, and easily manipulated. Welker used them to do his criminal bidding. One of the teenage co-conspirators created the threat image at Welker's direction, and both teenage co-conspirators posted it. Welker and his co-conspirators ensured that the Brooklyn Journalist would see the death threats by tweeting them directly at his Twitter handle so that the threat would show up in the Brooklyn Journalist's notifications. Welker

---

[6]   Curiously, the defendant blames his introduction to white supremacist groups on a 2009 incarceration that does not appear to be in his criminal history. See ECF No. 34 at 4.

himself posted the threat in FKD groups that he had reason to believe Victim-1 would see based on Victim-1's prior reporting on the group.  The point of the threats was for Victim-1 to see them and for the threats to have a chilling consequence on his journalism.  And the threats had their intended consequence—the Brooklyn Journalist saw the threat, was frightened for his life, and stopped publicly reporting on FKD.

The Brooklyn Journalist took the death threats seriously, in part because his reporting made him intimately aware of the violence FKD members perpetrated:

> I know from my reporting, including interviews with FKD members and the videos that Mr. Welker and FKD members shared online that they had access to firearms and practiced with them; that they made gun parts with 3D printers to create untraceable weapons; that they made homemade bombs and tested them on objects and infrastructure.

Exhibit 1 (Victim Impact Statement 1) at 1.  Indeed, FKD members have been arrested around the world for offenses involving violent weapons.  For example, in February 2020, an American member of FKD, pleaded guilty to illegal possession of an unregistered firearm in connection with his alleged plan to set fire to a Las Vegas synagogue and attack a Las Vegas LGBTQ+ bar.  See United States v. Climo, 19-cr-232 (D.N.V.).  In February 2020, another American FKD member, a U.S. Army soldier, pleaded guilty to charges that he shared instructions about how to make explosives online.  See United States v. Smith, 19-cr-40091, (D. K.S.).  In addition to these American federal charges, FKD members have been arrested around the world, including in the United Kingdom, Germany, Lithuania, and Estonia.

Welker is also an associate of an individual ("Individual-1") who was arrested on May 28, 2021 for allegedly planning a mass casualty event at a Walmart.  Prior to his arrest, Individual-1 led a white supremacist group operating on ECS-1 known as "Inkjet Division" (Welker later became a leader of the group).  On two occasions Individual-1 sent Welker money on Venmo, a money transfer application.

That the Brooklyn Journalist was afraid for his life is particularly notable given that his work has regularly placed the Brooklyn Journalist in danger, as he reported in his victim impact statement:

> As a journalist, I have been dispatched to report on wars, armed conflicts, violent uprisings, and other crises.  And I had always felt fortunate to be able to return to the United States and home here in New York City where I felt safe and secure after these dangerous assignments.  That was until I began receiving death threats from Mr. Welker and his FKD cohorts over my reporting on their violent activities.  Not even in my time and work in dangerous situations

9

abroad had I been so personally targeted or received such serious and explicit threats.[7]

Ex. 1 at 1.  The threat had real consequences on the Brooklyn Journalist, causing "tremendous stress and anxiety," and forcing him to "change[] daily routines," "t[ake] different routes to and from [ ] home," "avoid going out after dark," and to "declin[e] invitations from friends to meet in public areas."  Id.

In addition to instilling a real fear of immediate harm, the threats also affected the victim's livelihood, as the former head of newsroom safety for News Media Company-1 wrote:

> The intimidation tactic, devised to silence his reporting on Mr. Welker's group, impacted not only the [Brooklyn] Journalist's personal well-being, his professional obligations, and career.  They also impacted all the readers who would have benefited from learning of the tactics used by Mr. Welker's group.  The threats eventually led the [Brooklyn] Journalist's editors and managers to move him to other stories out of fear for his safety and that of the newsroom.  The [Brooklyn] Journalist has not published any stories about Mr. Welker, FKD, or other related groups since his return from a reporting trip abroad in early August 2021 to meet the founder of FKD that led to the cascade of threats.

Exhibit 2 (Victim Impact Statement 2) at 2.

Finally, the threats affected not just the victim, but the news organization for which he worked:

> Our newsroom's response to these threats was multifaceted, involving heightened security measures and an ongoing engagement with law enforcement.  However, the underlying damage to the principle of free speech and the right to report without fear of retribution cannot be overstated.  The ripple effects of the threats are far-reaching, affecting not only the targeted journalist and his newsroom, but, critically, the public.  The intimidation intended to silence one voice has in effect, silenced an essential conduit of

---

[7]     The defendant argues that Probation should "edit[]" the victim impact statements in the PSR.  ECF No. 32 at 1-2.  The Crime Victims' Rights Act provides victims "the right to be reasonably heard at any public proceeding in the district court involving release, plea, sentencing, or any parole proceeding."  18 U.S.C. § 3771(a)(2), (4).  Whether the victim impact statements are included in the PSR or not, the victims have a statutorily enshrined right to be heard.

> information, making victims of all those who rely on reporting to
> make informed decisions and engage with societal issues.

Id.   The August 2021 Threat specifically named News Media Company-1.   News Media Company-1 was also a victim here—it implemented heightened security measures and made editorial decisions based upon the threatened.   An above-Guidelines sentence is appropriate to adequately reflect the seriousness of the defendant's conduct because the death threats were made for the purpose of silencing First Amendment protected free speech activity.   The Guidelines calculation does not account for the fact that the defendant intended to interfere with a core pillar of our democracy: freedom of the press.   A just sentence will account for the fact that the defendant chose to use threats of violence to silence a journalist.

An above-Guidelines sentence is also appropriate to adequately reflect the seriousness of the defendant's conduct because the defendant's Guidelines calculation does not account for the defendant's racial motivation.   U.S.S.G, § 3A1.1(a) applies a three-point enhancement if "the defendant intentionally selected any victim or any property as the object of the offense of conviction because of the actual or perceived race, color, religion, national origin, ethnicity, gender, gender identity, disability, or sexual orientation of any person."   Here, the government did not seek an application of this enhancement because the victim in this case is white and was arguably not selected because of his race.   However, there should be no mistake: this was a racially motivated crime.   The victim was referred to in the threat as a "race traitor"—the implication being that he has betrayed the white race by reporting on the racially motivated violent extremist group that Welker led.   See United States v. Houghtaling, 390 F. App'x 604 (7th Cir. 2010) (applying U.S.S.G. § 3A1.1(a) where a white victim was targeted for being a "race traitor" and her husband was incorrectly identified as Jewish).   FKD is a hate group that targets those individuals that the hate crime motivation enhancement is meant to protect.   The defendant's sentence should reflect that the motivation for this crime was to silence a journalist who was reporting on an RMVE group.   The government's request for 46 months' imprisonment is in the middle of the Guidelines range—41 to 51 months—were the three-point enhancement under U.S.S.G. § 3A1.1(a) applied.   It is just for the Court's sentence to account for the fact that this was not a threat made against just anyone—it was a threat made against a journalist who sought to bring to light the insidious violence that FKD was committing and planning against racial and ethnic minority groups.

The defendant argues that he should receive a below Guidelines sentence to avoid sentencing disparities.   Notably, half of the cases cited by the defendant involved Guidelines, above Guidelines, or maximum sentences.   See United States v. Hughes, 17-173 (MKB), United States v. Feeney, 20-CR-541 (WFK), United States v. Florea, 21-CR-37 (EK), United States v. Smith, 19-CR-421 (RJD); United States v. Farooq, 19-CR-100 (PKC).   The cases that were sentenced below Guidelines are readily distinguishable.   Here, the Brooklyn Journalist was directly sent the threat.   This case is different from cases in which threats are made into the ether.   Cf. United States v. Hunt, 21-CR-86 (PKC) (defendant sentenced to nineteen months where threats were not sent directly to the victims).   Other cases cited by the defendant involve personal characteristics of the defendant not at issue here.   See United States v. Telfair, 19-CR-270 (ILG) (defendant pregnant at time of sentencing and sole caretaker of second small child); United States v. Cadet et al., 21-CR-57 (SJ) (defendant Cadet gave birth approximately two months before sentencing, defendant Thursday had no criminal history and was a sole caregiver of two small

11

children); <u>United States v. Celli</u>, 19-CR-127 (PAE) (government agreed to time served due to significant mental health issues and agreed to in patient mental health treatment); <u>United States v. Laufer</u> 15-CR-77 (RJD) (government agreed to time served which was only two months shy of a Guidelines sentence where defendant had no involvement with criminal justice system until he reached age 55).

### 2.     The Defendant's History and Characteristics

The defendant's history and characteristics further show that he is a danger to the community.  Welker was the leader of a racially motivated violent extremist group.  As described above, the group was known for the violence it planned and committed.  Members of FKD have been convicted around the United States and abroad for planning and committing acts of violence.

Since 2013, the defendant has been convicted nine times of various crimes.  The defendant has had multiple protective orders filed against him, including by his mother.  Troublingly, the defendant was twice convicted for violating a protective order.  When Welker was arrested, law enforcement interviewed some of Welker's family members, who have described a 2013 incident in which Welker demanded money from his mother, and after she refused, he grabbed his mother by the neck causing the two to fall to the ground.[8]  After Welker's mother screamed, a female associate of Welker's, who was nearby, attempted to intervene, and Welker struck his associate in the eye.  Welker's mother feared that Welker would obtain a knife from his room and use it against her, so she had another family member call the police who came and arrested Welker.  Following this 2013 incident, Welker's mother obtained a five-year restraining order prohibiting Welker from contacting her.  A member of Welker's family reported to law enforcement that, during the effective period of the restraining order, Welker repeatedly violated the restraining order by coming by his mother's house, including at least two occasions on which Welker's family members contacted local police to report the violation.  Welker's family members have also reported to law enforcement that they have had a history of threatening encounters with Welker, including occasions on which Welker has threatened to harm himself.  Welker was also convicted of battery in 2017.  The defendant has shown time and again that he is willing to commit acts of violence and to ignore court orders meant to protect people.

Moreover, the defendant's violent and predatory tendencies continued even after the instant offense conduct and even after his arrest.  In October 2022, prior to his arrest, the defendant was expelled from a drug rehabilitation facility in Santa Clara, California.  PSR ¶ 22.  The government learned that the defendant was discharged due to (i) racist remarks and comments in support of white supremacy; (ii) chatting on a pro-racist website; (iii) downloading Nazi propaganda; and (iv) possessing a weapon fashioned out of a kitchen fork.  The defendant joked about his expulsion in messages to others: "I just got kicked outta the rehab I was at cuz of spics and a kike conspiring against me . . . this jew here opened that pdf and showed like everyone. I

---

[8]     Statements attributed to individuals herein are reflected, in sum, substance and in part.

12

hadnt even read it . . .  Kinda funny now that I think about it hahah . . .  He read the beginning part about shooting n****rs at a grocery store."

While detained at the Metropolitan Detention Center ("MDC"), the defendant has continued to engage in aggressive behavior and hateful communications, and has continued to coordinate the business of FKD, for example by passing messages and instructions along to FKD associates.  For example:

- On May 29, 2023, the defendant emailed an associate from the MDC and asked the associate to contact a former FKD member on his behalf.  The member is currently an organizer of various white supremacist groups online.  The defendant also asked the associate to contact another individual who is the leader of a neo-Nazi group that openly advocates for violence.  PSR ¶ 18.

- On May 31, 2023, the defendant spoke by phone from the MDC with an associate who used a Google Voice phone number ending in -1488 (Associate-1).[9]  During the call, the defendant discussed a video that depicts him peeling LGBTQ+ pride stickers off of a bus.  The defendant asked Associate-1 and another individual on the call to post the video online with the caption, "What the feds arrested Wrath for."  As discussed above, the defendant used the handle "King ov Wrath" on messaging platforms.  PSR ¶ 19.

- On July 27, July 30, July 31, and August 8, 2023, the defendant sent and received emails to a representative of an online group called the Justice Initiative, in which he provided information about FKD and the instant case, including identifying Victim-1, for distribution by Justice Initiative to its supporters.  According to its website, the Justice Initiative is "a Prisoner Support Directory whose mission is to support the group of inmates who need it the most: those Whites persecuted by an anti-White system."  PSR ¶ 22.

- On August 16, 2023, the defendant boasted on a phone call about an altercation between him and a Black inmate at MDC, whom he referred to using the racial slur "jogger."  The defendant stated, "A jogger tried to extort me for phone time in here.

---

[9]     Google Voice is a Voice Over Internet Protocol ("VoIP") application that allows users to place and receive telephone calls over the internet.  Among other features, Google Voice allows users to create their own phone numbers.  The number "14" is significant among white supremacist groups and is a reference to the slogan "14 Words," which refers to the phrase, "We must secure the existence of our people and a future for white children."  The number "88" is also significant among white supremacist groups and is a reference to the phrase "Heil Hitler" because "H" is the eighth letter of the alphabet.  The defendant has used "1488" as an email sign-off, including in an email he sent from the MDC on August 7, 2023.

But the conflict ended with me slamming my cell door in his face in front of his entire gang."  PSR ¶ 23.[10]

The defendant argues that he should receive a below Guidelines sentence for two central reasons: (1) he is not dangerous; (2) he is addicted to drugs, has never had a job, a relationship, or a sense of purpose.  For the reasons that follow, both of these arguments are unavailing.

The defendant argues that "More serious threats cases involve repeated harassment or accompanying conduct (or a criminal history) that evince the capacity or intent to act on the threat."  ECF No. 34 at 1."  This statement is directly contradicted by the record.  Victim-1 was repeatedly threatened.  The August 2021 Threat was tweeted at him at least twice, it was posted numerous times by Welker in places that the Brooklyn Journalist would see it, Welker reposted the threat again in March 2022, and there was a third tweet directly at the victim that implied, "have you seen our threat?"  The record shows that there was repeated harassment.  And there is accompanying criminal history that evinces the capacity to act on the threat.  Despite the defendant's attempt to make his lengthy criminal record appear to be entirely drug possession offenses—the defendant's criminal history shows that he is dangerous.  As described above, in 2013, the defendant pushed his mother to the ground, strangled her, and threatened to kill her over her refusal to give him $35.  PSR ¶ 41.  When a family friend attempted to intervene, Welker punched the friend in the face.  Id.  Welker was also convicted of battery in 2017.  Id. ¶ 56.  There is other evidence of violence in Welker's background that did not result in convictions.  When Welker was arrested in 2013, he told the officers he had a prior arrest for a weapons violation involving brass knuckles which were designed to produce an electric shock equivalent to 50,000 volts.  Id. ¶ 40.  The defendant was also twice arrested for assault with a deadly weapon id. ¶¶ 57-58, as well as a separate battery offense, id. 60.  Finally, after making the threats but before he was arrested, the defendant was kicked out of rehab for, among other things, possessing a weapon fashioned out of a kitchen fork.  The defendant's argument that he does not have a criminal history to evince the capacity to act on the threat is not borne out in the facts of the case.

The defendant also argues that he is not more dangerous because he is a member of FKD.  ECF No. 34 at 1.  He even posits that "the extremists he associated with on the Internet were a healthier crowd than his real world friends."  But the defendant is more dangerous and more of a threat to the Brooklyn Journalist, News Media Company-1, and society at large because he is a member of this violent group which has members around the world.  The Court need only to look at the instant threat to understand how being a member of FKD makes the defendant more dangerous.  Here, the defendant issued the threat because the Brooklyn Journalist tried to interview an Estonian teenager (ECS-1 User-1).  He used a teenager in Argentina to make the threat (Minor

---

[10]    The defendant objects to including this conduct in the PSR, ECF No. 32 at 1, because it is "free speech."  But this conduct is relevant to sentencing because it shows the defendant communicating with individuals committing violence, the defendant's own bragging about acting violently at the MDC, the defendant getting the victim's name to the public, and the defendant misrepresenting the basis for his arrest.  All of these are relevant to the Court's sentencing determination and should be included in the PSR.  Notably, the defendant does not contest the accuracy of these paragraphs.

14

Co-Conspirator-2) and the same teenager and one in Ohio (Minor Co-Conspirator-1) to tweet at the defendant. That members of FKD are willing to make threats on behalf of one another shows that his membership in the group does contribute to his threat level. And, as described above, FKD members do not stop at just threats. Numerous FKD members around the world have been convicted. And other violence goes uncharged, as the Brooklyn Journalist described in his victim impact statement. <u>See</u> Ex. 1 at 1. The defendant argues that "He is not alleged to have any association with hate groups outside the Internet." ECF No. 34 at 6. But of course, the instant offense did not require him to have associations outside the Internet. His online co-conspirators are dangerous, whether they meet in person or not.

Finally, with respect to dangerousness, the defendant argues that he did not take any tangible steps to carry out the threat" or "engage[] in any related acts of violence." ECF No. 34 at 1. But of course, had he, he would have been charged with a different crime. The Guidelines here already take into account that this is a threats case, and that the Brooklyn Journalist did not suffer any physical injury.

Next, the defendant argues that the Court should give the defendant a below Guidelines sentence because of his "lack of purpose, goals, structure, and anything resembling accountability and real-world connection" and because "he has never learned to live as a functioning adult in the real world." ECF No. 34 at 2, 6. Welker describes a history of addiction that began with prescription pain medication. <u>Id.</u> at 3. A history that is unfortunately all too common, as the defendant points out. <u>Id.</u> But while the U.S. Department of Health and Human Services estimates that 10.1 million people misused prescription opioids in the past year,[11] not everyone with an opioid problem commits violent crimes. The defendant's drug addiction does not excuse his conduct. Nor does the defendant's argument that his addiction has so drastically negatively affected his life to the point that he has never had a steady job weigh in favor of leniency. The defendant identifies real problems, but not how a below Guidelines sentence will help him find a job, or purpose for that matter. Rather, the defendant's spotty background shows that he is presently and will remain a danger to the Brooklyn Journalist and society.

### 3.     Specific and General Deterrence

Finally, there is a need for both specific and general deterrence in this case. As to specific deterrence, as outlined above, the defendant has a history of violence and the instant offense involved threats of violence. A significant sentence of incarceration is needed to ensure that this defendant is not able to harm anyone, or work with other members of FKD to commit acts of violence against journalists or racial, ethnic, religious, or other minority groups.

As to general deterrence, the government cannot put it more eloquently than the victims themselves: "Freedom of the press is a core principle of our democracy. Journalists must not be threatened and intimidated by anyone for doing our work. It is unacceptable and dangerous," Ex. 1 at 1, and "In a democracy, the role of the press is indispensable, and actions that undermine this function threaten the very foundations of our free society," Ex. 2 at 2. The Court's

---

[11]      <u>See</u> https://www.hhs.gov/opioids/statistics/index.html (last visited April 15, 2024).

sentence should send a message of general deterrence—that society will not tolerate those who threaten some of the bedrock principles of our democratic society—freedom of speech and freedom of the press.

Accordingly, the government respectfully submits that an above-Guidelines sentence of 46 months is necessary to adequately punish the defendant for his crimes and provide both general and specific deterrence and to provide a sentence that is sufficient but not greater than necessary to achieve the goals of sentencing.[12]

IV.    Conclusion

For the foregoing reasons, the government respectfully requests that the Court impose an above-Guidelines sentence of 46 months' imprisonment.

Respectfully submitted,

BREON PEACE
United States Attorney

By:    /s/_____
Ellen H. Sise
Andrew D. Reich
Assistant U.S. Attorneys
(718) 254-7000

cc:    Clerk of the Court (PKC) (by ECF and E-mail)
Defense Counsel (by ECF and E-mail)

---

[12]    The government notes that the Probation Department recommended a top-of-the-Guidelines sentence of 30 months based on an incorrect Guidelines calculation. With the correct calculation of 30 to 37 months' imprisonment, the government presumes that the Probation Department would have recommended a sentence of 37 months' imprisonment. As noted above, the government submits that a top-of-the-Guidelines sentence is not sufficient, and that an above-Guidelines sentence—as the government advised the defendant at the time of the plea it might seek—is warranted here.